s, and we'll hear from Mr. Smith. Good morning, Your Honor. Good morning. It's my privilege to represent Bonnie O'Daniel in this case. As we all know, it's a very important issue, and I'm privileged to be able to present this to the Court. The premise of my argument basically is the Price Waterhouse case. The Supreme Court handled it, quote, sex is not relevant to the selection, evaluation, or compensation of employees, end quote. It's an impermissible consideration. And I'd like to go next to the point that the District Court in this case found that Bonnie O'Daniel did not engage in protected activity because Title VII does not prohibit discrimination on the basis of sexual orientation, and therefore Bonnie O'Daniel could not have a reasonable belief that defendant's actions were unlawful. Let me ask you a hypothetical. Sure. If a white employee filed some sort of, or wrote some sort of blog that was a very racist rant against black people and was then fired by a private employer, would that be a firing based on race or a firing based on racism? I'm not sure I can answer that question. You know, I think that it could be a firing based on race. I mean, it would depend on how the finder viewed it, I think. But I think it could be a firing based on race, and particularly if you couple that with other circumstances. So we've had a lot of public situations where employees of, again, we're talking about private companies, and I'm putting aside the issue of the Louisiana free speech, I'm just talking about Title VII. We've had a lot of cases where people have gone off and done something racist, and they've been fired by the company, and, you know, the public was in an outrage at various well-known entities, and the person was fired. You're saying those people now have a Title VII action? I don't want to go that broadly. I don't know. I mean, it's very case-specific, I think. And in this case, we have not only the post, we have the three instances of overt opposition by Ms. O'Daniel to sexual orientation discrimination. And that's what I think you've got to look at those events as a series of events, not just Facebook posts, but couple that with the three instances of opposition. And I quote Paragraph 28 of the First Amendment complaint, Paragraph 45 of the First Amendment complaint, and Paragraph 54 of the First Amendment complaint, all three clearly overt objections to discrimination on the basis of sexual orientation. My second point after Price-Waterhouse is that it is reasonable for, it is plausible that a person in Bonnie O'Daniel's position could in good faith reasonably believe that sexual orientation discrimination is unlawful. Of course, you all know about the legal landscape that is involved in this case. Two courts of appeal have held en banc that it is reasonable. In fact, they believe that Title VII prohibits sexual orientation discrimination. I don't believe that this court needs to reach— I'm not questioning whether we have to reach this issue. I agree that's a complicated issue. But to me, I'm just pushing back against the notion that a company has to keep people in this day and age of, you know, sort of Twitter shaming and so on companies and people not doing business at companies that they feel are racist, sexist, anti-LGBT, et cetera, that somebody has to keep on their payroll a person who's espousing those kinds of views. Again, just on the Title VII rule, not reaching the Louisiana speech question yet. I understand, but I think that's a factual issue for the fact finder. I mean, the jury could certainly consider whether that was a firing offense or whether the post was a firing offense or whether— No, the jury doesn't get to decide whether it's a firing offense. It has to violate Title VII. So, I mean, it's otherwise at will employment. So, you know, if you think you're doing a good job and I don't think you're doing a good job, I can just fire you, right? It's only that I can't fire you because you're a man. And I think that it's plausible from the complaints in this case that Bonnie could in good faith reasonably believe that sexual orientation discrimination is unlawful. And we have a very much series of events that show aggressive retaliation against Ms. O'Daniel. And they follow very closely after not only the Facebook post but the three instances of overt opposition to sex discrimination. This is not a case where you can take the Facebook post and take it in the abstract, I mean, in a vacuum. You have to look at the whole situation, including the aggressive retaliation, including the overt opposition to sexual discrimination on the basis of sexual orientation. And, you know, I don't think that the fact that, you know, the Facebook post may offend persons, I don't think that's a waiver of Title VII rights. It's certainly matter that can be considered by the fact finder. But, I mean, Bonnie O'Daniel could have reasonably believed that. You know, EEOC in 2015, the agency charged by Congress with the responsibility of interpreting Title VII, Baldwin v. Fox, held that sexual orientation discrimination is prohibited. I want to point out, I don't think this Court has to reach the issue of whether sexual orientation discrimination is prohibited by Title VII, either by the panel or on BOC. I think that, as EEOC suggested, I think it's proper to narrow the issue in this case and suggest to the Court that the issue is whether there's a reasonable belief that sexual orientation discrimination is unlawful. And the District Court held that it was not. And that's ripe for decision by this Court. The EEOC has not only decided Baldwin v. Fox. It's filed enforcement actions based on its view of the law. It has an EEOC website. It's got guidance to employers on sexual orientation discrimination. And they routinely process these sexual orientation charges. You know, in light of that, I think her belief is reasonable. I think that, you know, we could get down to the trial and have a fact finder determine that it was or was not reasonable. But, I mean, on the face of the papers, I don't think it's appropriate to say that it was unreasonable. Your client suggests, too, that when she complained about the way she was being mistreated, Ms. Huber, her complaint was not investigated, but no reason was given for that. That's what I understand. But Ms. Huber's complaint was investigated. Right, right. And, of course, Ms. Huber was the president, right? Right. What is the business of this company? I'm not sure. I just wondered. Industrial service plant and power. I couldn't tell whether it was landscaping or employment or what. I think they provide services to industries in certain areas. I'm sorry I don't know that, but I don't. Maybe counsel will know that. The case of Havli versus Ivy Tech, I think, is a straightforward statement of what we believe the law is. It says discrimination on the basis of sexual orientation is a form of sex discrimination. It is a subset of sex discrimination. It is a function of sex. It is impossible to discriminate on the basis of sexual orientation without discrimination on the basis of sex. And that any job decision based on the fact that the complainant, man or woman, speaks differently, dresses differently, or marries a same-sex partner is a reaction purely and simply based on sex. Well, let me ask you a question. In characterizing the complaint, the court says while plaintiff attempts to couch her retaliation claim in terms of sex discrimination, she is in fact proposing to allege a claim for retaliation on the basis she reasonably believed that she could not be discriminated against based upon her sexual orientation. Okay, so maybe the court is distinguishing between discrimination against her as a female and discrimination against her as a heterosexual. It is unreasonable for plaintiff to believe that discrimination based on her status as a married heterosexual female constitutes sex discrimination. All right, well, do you agree with those statements? I agree that's the way the district court framed the issues. I disagree with the ultimate conclusion from that, but I think that's what brings the issue to this court so squarely. And I see that I'm out of time. I've ceded five minutes to amicus. All right, sir. Thank you, Your Honor. Yes, Mr. Nevins. Thank you, Your Honors. I appreciate the opportunity to be here today to address this court on this issue. I want to start off by pointing out one problem with the employer's brief in this case where it says this court has repeatedly and consistently held that sexual orientation is not covered by Title VII. For that proposition, of course, it cites Bloom, but then it goes on to cite Brandon and Stewart v. Brown-Greer, which definitely were not holdings to that effect. I understand why you want to advocate the position that sexual orientation falls under sex under Title VII, and I respect that. I'm just a little troubled by the notion that all of these companies that have been firing people who have been making racist, sexist, and other types of similar rants on Facebook, et cetera, and then the public gets up in arms and all of that and they solve the problem, if you will, by firing the person. And your argument is that subjects them to Title VII liability. And that seems an odd argument for you to be making. No, no, no, and that is not my argument at all. And I do want to make this very clear. My only argument here is that the aspect of the – this court should not affirm because it says the belief of an employee in mid-2016, or really at any time I would argue, is unreasonable that Title VII covers sexual orientation discrimination. That is my only argument here today. I am not – and I'm glad Your Honor raised this point. I am not here to say that Ms. O'Daniel's belief that she experienced sexual orientation discrimination or that she was legitimately complaining about actual sexual orientation discrimination. I am not saying that belief is reasonable. But do we even need to reach the issue? I believe you do not, and I would encourage you not to, Your Honor. And to that extent, I fully acknowledge that while we call ourselves friends of the court, we may not be that helpful because we really did – I mean honestly, I thought we were coming after the low-hanging fruit here. I thought we were coming after the easy issue, but the district – but that I believe that the district court said clearly – and I thought we needed to address this issue. The district court said it was unreasonable for an employee to believe that sexual orientation discrimination was covered by Title VII. That's what spurred us into action. That's what made us come here and say to this court, please do not affirm that ruling. You may rule for the employer on any number of other issues, including the belief that this was sexual orientation discrimination, that that was even going on here at all, or that the company was not – did not have a legitimate non-discord. I mean there may be any number of reasons why you might rule against Ms. O'Daniel. I'm here only to argue that the district court statement that it was unreasonable to believe for an employee, a lay employee to believe this, that sexual orientation discrimination was covered by Title VII, was unreasonable, that you should not affirm that ruling. And that's all I'm here to do. Well, and that's a very modest position. And why is that of such significance to the ACLU that you're promoting that here? Because, Your Honor, as I go across the country and I do, arguing to courts to actually take a further step to say that it actually is – it would be unhelpful to have this court opine that I'm arguing an unreasonable position. And I don't think this court especially should do that while – we're still in the middle of the ballgame. We don't have the final score yet. And in that respect, I would also mention the fact that – the court may well be aware – the Supreme Court has two cert petitions pending on this issue. Okay. Well, I mean maybe I accept that. But that's really trying to use us to say something that we – that may have no real grounding in the law. And it's very difficult for some of us to accept that. And I'm not asking this court to rule that sexual orientation is discrimination. I'm just asking you not to say it was unreasonable. I mean, so you may – and I would also point – this court has repeatedly exercised excellent judicial restraint on this issue. There have been times, especially in the past few years, in both published decisions and unpublished decisions where this court has been asked to reach this issue. And in the Brandon case, it did not reach this issue. And it repeatedly, when it wasn't necessary to do that, did not do that. I want to – sometimes I come before courts and ask them to do quite a bit. I'm asking this court to do nothing other than not affirm the decision. I'd like to do nothing. I believe in judicial restraint. I believe this court does too. And historically – and I'm here only to ask that you not affirm the ruling that this was an unreasonable legal belief because so many judges throughout the 11th Circuit and the 5th Circuit didn't see Bloom as a binding holding. And maybe they were wrong. Maybe they missed something. But I don't believe any of those jurists were unreasonable, and I certainly don't believe that a lay employee was unreasonable. Some of us missed something. Yes, and people miss things. But when we're talking about branding something as unreasonable, I think that that's a bad thing. And, of course, eventually my coverage position might be upheld by the Supreme Court. And even if it's not, I don't think it's unreasonable for all the judges in Zarda and Hively that did rule that way to brand them unreasonable. I thank the court for its time. If there are any other questions. Okay. Thank you. Good morning, Your Honor. Mr. Scott? Mr. Scott, yes. Thank you. May it please the court. I'm going to take my argument a little bit out of order to address, I think, the points raised by Judge Haynes. I don't think we have to reach the main issue of whether or not Bloom is still good law. We obviously think it still is until a non-blanc decision is rendered in this court. The district court based its decision in dismissing the retaliation claim really on two bases, one that she could not have formed a reasonable belief that sexual orientation discrimination was covered by Title VII, and the second one was the alternative holding, which was under the facts as alleged in the first and second amendment complaint, a reasonable person would not believe that they were being subjected to sexual orientation under those circumstances. And that goes to the point of we're really not talking about discrimination based upon Ms. O'Daniel's sexual orientation. We're talking about discrimination that may have been raised or implicated by the Facebook post that she chose to put there. Not all heterosexuals are anti-homosexual. Exactly. Not all white people are anti-black. Not all black people are anti-white. So it is not an essential trait of one race or gender or sexual orientation to be anti the other or others. Is that a fair statement? Absolutely correct. The posting at issue could be found to be equally as offensive to a heterosexual and a non-heterosexual. It might also not be offensive to a large number of the American people. And it may not be. And that sort of goes back to the original issue that we're really not going to get to, which is when this law changes, it needs to change in Congress. Those are our founding principles. But a heterosexual could be offended by homophobic statements by somebody, and so could a homosexual, right? Correct. She could be offended even if you don't fall in the class of people being mistreated or called out or whatever the term is. Correct. The statement, the complaints are basically stereotyping the decision maker in this case and saying that, well, because she is of a different sexual orientation than me, then she must have been offended by this post. And had she been the same. She clearly was offended, and she clearly wanted the plaintiff fired. I mean, there's just no, you know, the allegations are unequivocal. They may not be accurate, but they're unequivocal. And I think the district court accepted that. But it doesn't mean that she was fired, Ms. O'Daniel was fired because of her sexual orientation. And that's really the crux of any discrimination case. She's got to show that she was treated differently. He wasn't resting on the termination for, I mean, he was resting on retaliation. Right. Retaliation. Well, there was some confusion in the initial iteration of the complaint. There was a claim of straight up I was discriminated against on account of my sexual orientation. I don't understand him to be focusing on that today. Correct. Today it's not. And so the other basis that the court made its ruling on was that it would not be reasonable. You could not have a reasonable belief when the law says what the law says in this Fifth Circuit. And so when you look at the cases and it's the right way decision that this court issued in 2016, it recognized that there are going to be situations where what an actual violation is might be different than what somebody might reasonably perceive to be a violation of the law. The court goes on to talk about the gray area. And typically the gray area exists in a harassment claim where you're trying to establish the degree of conduct necessary to meet the severe or pervasive standard or what types of things constitute discrimination. A retaliation claim is different than that because a retaliation claim has to be based on activity or conduct that's been made unlawful under the statute. To me, right way was a retaliation case. It was a retaliation case. But the substantive allegations of the substantive discrimination was, and I believe it was sex in that case, it was specifically prescribed by the law. Well, what it was was a woman who talked, complained to a supervisor, if I recall correctly, because she saw one fellow act inappropriately toward another employee and she thought that was harassment. Correct. And it probably wasn't, frankly, under Title VII, but that's why right way says, well, you can have a mistaken but reasonable belief about what constitutes sex harassment. Exactly. And the point I'm trying to make is sex harassment is unlawful under Title VII. So you're saying you can't have a reasonable belief grounded in a misapprehension of the law. That's what I'm saying. Even though some of the courts have been in the Fifth and Eleventh Circuit have shared that misapprehension. Yeah. I haven't found a single case that suggested that you could have a reasonable belief that the law was something other than it was. The Seventh Circuit, before the Hively decision, if you look at the Hamner case, which is actually cited by Lambda Legal, that provides the best description as to why it's different when you're talking about the degree of conduct necessary to trigger this reasonable belief, as opposed to the type of conduct. So there he is and maybe a close call on facts. That's different from where the law is established and you just don't know about it. Correct. So we're not talking about what did she subjectively think. We're talking about what a reasonable person would think knowing the law. Yeah. I mean, reasonable basis, part of that phrase is being objective. It has to be objectively believable. And part of that is even though 99% of the population doesn't sit around reading cases all day long, they're out there and if they're out there, then the person knows about them. It's just as reasonable for us to, if we're going to impute knowledge of the entire universe of cases going on with sexual orientation discrimination, why can't we just impute what's going on in the Fifth Circuit? So I think the issue is it comes down to the type of conduct and whether that conduct is. Well, let me ask you this. So I'm still really debating whether we have to get into any of these kind of interesting issues because I think the law is that she could be fired for having filed this post, period. But Mr. Smith points out that she wasn't fired like the day after the post. There was all this other events. And what is your response to, well, these other events show that, because you can't use that as a cover. I can't wait around for an employee to be late and use that as a cover to fire somebody that I have some discriminatory intent to, which I don't. But Mr. X can't do that. So he's saying these other events show that this was really a cover for firing her for being a heterosexual woman, although I imagine there's other heterosexual women at the company that haven't been fired, but that's another question. So tell me about that. Why did these three subsequent events not change this from just being fired for the post? Well, it goes back to the issue of she's claiming heterosexual. She was fired because she was heterosexual. Obviously, in the 12v6 motion, we have to accept as true all the allegations. So obviously there's an other side of the story to be told, maybe, maybe not. But as far as what's in the record, those complaints that she made, we have to accept that she made them. That Seventh Circuit decision in Handler says it doesn't matter how many times you complain. It doesn't matter how – as long – if the conduct is not illegal, there's no retaliation claim. So I guess what I'd say is it's not really relevant. But she files this post that really calls out an issue that is important to her boss, and her boss then is mad at her and doesn't treat her very well. You're saying that is not a violation of Title VII. Exactly. That's at-will employment. There's no exception to at-will employment on that basis. Well, let's – I mean, assuming for a section a bit that she could have a reasonable misapprehension based upon the trend of the world, suppose you had a black employee who posts something that's anti-white on Facebook, you know, like congressman so-and-so looks like a Klan member. And then he has a white boss who takes umbrage at this, a black characterizing somebody without focus as a Klansman. The white boss takes umbrage. The white boss allegedly goes around complaining, that guy has to be fired. We're going to have reasons to fire him. The other one says, no, you can't file a discrimination claim. And the white boss makes a – files a complaint about the black guy that gets investigated internally, but the blacks doesn't. The black turns around and files suit. I'm retaliated against. And I think the distinction there, Your Honor, is that race discrimination is clearly covered by Title VII. Could he reasonably have believed that he – you're begging the question. Could he reasonably have believed that he was being fired not because – simply because of his they don't like bad behavior in Facebook, but because he's a black exhibiting bad behavior in Facebook. Well, I think that shows that he – in your scenario, he subjectively believed it. Yeah, but you – I don't think that means it's reasonable. Every court in this country would allow that claim to go forward because he's a black. He's fired by a white boss. And I agree. I think what distinguishes that scenario – I don't agree. Well, I think what distinguishes that decision from this decision is the fact that the protected class – and you still have to show obviously that it was because of the race. If that – in that particular scenario, if they could show that I wasn't – I didn't do this, I wasn't fired because of my race, it was some other reason. I'll step back from what I said. I'm not saying that that would necessarily be an accurate claim, but I do think that it would survive a 12B6. And, again, I think it's the classification – I think that issue may be a bigger issue than the one you all think is the big issue because of the world that we live in where – I mean, I recall – I don't remember the company, but a very rich employee was sitting on a train, and she made some really offensive remarks to a black lady sitting next to her, and this became somehow public as having somebody filmed it or something like that. That woman was fired from her $100,000 job. Does she have a claim? I mean, she was white. The person she was being offensive to was black. But the problem wasn't that they were white and black. The problem was what she was saying. And so how is that the same thing as discrimination based on race? It's discrimination based on your conduct. If somebody's late to work, they can be fired, okay? And so that is discrimination based on conduct. You were late to work. So I'm concerned about this notion that, oh, my gosh, if the person of a certain race makes a racist remark, that is discrimination based on race, not racism. I disagree with that. And I agree completely. The at-will employment doctrine allows a company to fire somebody for a good reason, bad reason, no reason, provided that it doesn't violate a statute. In that situation, companies, we see it every day in the news, they're being hit by special interest groups that are putting pressure on their relationships with their customers, with other employees, with the specific desire to convince the employer to fire the person. Is there a basis to affirm what the district court did without saying that there's no legal basis for reasonable belief? Yes, Your Honor. Well, not in the context of the right way of reasonable belief. I think you could turn around and you can affirm the decision. Can't you just say she can be fired for posting on Facebook a rude remark, period? Isn't that the end of it? That's what the judge said at the end. Why isn't that a basis to affirm that doesn't require us to get into reasonable beliefs, is sexual orientation covered, or anything else? She filed a post that was very inappropriate. Her employer doesn't want her around anymore. Why isn't that the end of the matter? I feel like I'm missing something because I'm the only one making this point, and the district court made the point too, and I don't see why that doesn't end the matter. And I agree with you, Your Honor. I mean, I think the facts of this case are such that she wasn't fired for sexual orientation. The allegations are such that she was fired for making the post, and that is false with an at-will employment. It doesn't trigger any of these reports. But the problem is not that she was fired immediately after she made the post. The problem is that the woman who had previously been her friend is no longer her friend, and the woman takes the thing as an affront against all members of the LGBT community, and then they go, you know, again, according to her allegations, she says, lay off me, I'm a good employee, and they don't lay off her. They change her working conditions significantly. Your client, that is to say. So it's not at that point, as Judge Haynes asked earlier on, it's not just the post, is it? Well, respectfully, I think the fact that they had a good relationship as alleged in the complaint supports what you're saying. But we're talking about 12b-6. We're not talking about summary judgment. I understand that, but I'm just getting to the question. I think the fact that they had a good relationship shows that she didn't harbor any animus towards heterosexual employment. A viewer could have been heterosexual but have a lot of friends that are in the LGBT community or a child who is or whatever and be offended anyway. I mean, you do not have to be a member of the LGBT community to be offended by people who make snide remarks about the LGBT. You do not have to be black to be offended by people making nasty comments about black people. So I'm not buying the notion that this is based on your sexual orientation, your race, your gender. I'm saying when you make these kinds of comments, you put yourself out there that an at-will employer can say, hey, I don't like that, and this is obviously putting aside the Louisiana free speech argument, which I frankly don't think has a lot of merit. That would be a different question because obviously it was speech. But I don't think Title VII protects you from being a jerk. But, again, I respect that others may disagree with how I'm framing this, and that's their call. This is how I'm seeing it, and I may be missing something, and my colleagues may correct me and show me that I'm wrong, but that's how I'm seeing it. Yeah, I guess how I would respond to that was I think I agree with your ultimate feeling on it, your gut feeling on it. I think you do have to go through it. It's not a gut feeling. It's based on the law. I know, but I do think we have to go through the reasonable basis. The retaliation analysis is set forth in Title VII under the Opposition Clause. I still think we have to go through that. We get to the same exact point that it was not reasonable for her to assume that this triggered, and I think this was a point that Mr. Nevins was making, was that under these circumstances she shouldn't have felt that she was being singled out because of her sexual orientation. And I do think we are saying the same thing in that regard. What does your company do? They're a construction company working petrochemical. They provide staffing to all sorts of jobs. They specialize in aluminum construction, so it's a blue-collar environment, although she was the HR manager and recruiter. She worked in the office with Mr. Simino, who was there. That's a scary thought. How many employees? Originally it was a smaller company when it was plant and power. I think they had fewer than 200 employees. They were absorbed by a larger company, ISS, which I think they have over 500 employees. It's a much bigger company. Okay, so I hear you saying two different things. On the one hand, you're saying we ought to go through the exercise of saying whether you can have a reasonable belief. And on the other hand, you're also agreeing with Judge Haynes that we don't even need to reach that in order to affirm what the district . . . No, and I'm sorry. I don't see a way where we can go through this without getting into the reasonable belief analysis. Okay. Why not have a district court did it? I'm saying even if blah, blah, blah, blah, blah, she still loses. Even if sexual orientation is covered, even if she had a reasonable belief, that ain't what the pleading shows as the basis. So her pleadings still don't support that that was the basis for the firing. Why isn't that the even if approach? Why doesn't that work? Yeah, I agree that's the alternative holding. I think that's fine. That's focusing on . . . Well, that is what I'm saying, and you just said I'm wrong. No, no, no. The alternative holding, and I'm sorry, the alternative holding is legitimate, and it's in our brief. But the even if approach works, and it's a . . . Mr. Nevins was advocating for that kind of judicial restraint to say it doesn't matter. Either way, the law is she still loses. You can do that as a court. You don't have to reach the big ticket items, although I think that's a big ticket item, the notion that you can't fire people for making inappropriate remarks on Facebook is a little bit concerning to me because I think that is a big ticket item. We're talking about, again, private employers in the ordinary course of at will and all of that. I think they can. It happens frequently. We deal with that all the time. On the constitutional question, I don't know if you have any questions about that. There's not a case in Louisiana that we've seen that allows that to be brought by against a private employer. The case that they reference is, in our opinion, pretty much straight-up dicta. But even if somehow that did apply, the constitutional provision does say you are bound by the results of your exercising your free speech rights, and I would argue that that's consistent with the position we're taking. If that means you're going to get terminated, that means you're going to get terminated. It doesn't mean you can't say what you want to say on Facebook. It just means that there may be ramifications that you don't like because of that. Thank you. All right, sir. Thank you. Mr. Smith? I want to talk briefly about the state law claim. We have a situation where there's a race-over issue in Louisiana law about whether Article I, Section 7 applies if there's not state action. In the case of Morassi, which is versus State Department of Wildlife and Fisheries, Louisiana Supreme Court, which I've cited, I'd like to quote the expression, quote, no law shall, end quote, was not used, indicating that the protection goes beyond limiting state action. That's Louisiana Supreme Court. It's talking about Article I, Section 5, which is the same proposition that I'm asserting that Article I, Section 7, the second sentence of it, is not required to be state action since that is a race-over issue. We're asking the court to consider certifying that to Louisiana Supreme Court. I think it's an issue that they should decide. There's numerous mentions in all the Supreme Court decisions that perhaps that is the case, but I think it should be certified. Judge Haynes, I just disagree with you about the degree of offensiveness of the post. I'm not going to defend the post totally, but it did concern a very legitimate issue that concerns a lot of people in the United States. It concerned the Houstonians so much that they overturned an ordinance on that basis. Right. You know, people are concerned about young daughters in the bathroom with grown men. This wasn't written that way. This wasn't written as maybe we need to have bathrooms for women and bathrooms for men. The way it was written was quite offensive, even assuming arguendo that reasonable people can disagree on bathrooms. I don't think this was in any way written that way. Just like with Roberta. I mean, it's not written that way. A trier fact could believe that it's not as offensive as Your Honor believes. It's a fact issue. I would suggest to the court. It doesn't matter what I think is offensive. It matters whether the finding that this is offensive means that this was discrimination based on sex, sexual orientation, whatever. I mean, that's the problem. And so when you write stuff like that, I mean, if somebody writes something about all Democrats are great or all Republicans are great or whatever, you can still offend people with that without it having anything to do with race, sexual orientation, gender, whatever. And if it's an at will employment and if the Louisiana free speech doesn't apply, you know, that's life. Let me say, we're framing this as a retaliation case. But it's retaliation for what? Making the post or being a heterosexual married woman? It's all of the facts. That's the problem. The boss tried to get her husband fired, too, according to your allegation. I mean, it was aggressive retaliation. And it was like. For the post. Well, for the overt acts of objecting to sexual orientation discrimination. I mean, I don't know that you can decide causation on the face of a paper. You have a very close temporal proximity here. A jury could believe that her complaints of sexual orientation discrimination were causative. Not really sole cause, but were causative. And that's what I'm saying. This case needs to go forward. It shouldn't be decided on a 1286 motion. There are factual issues. I totally understand your concern and respect your concern about the post. But, you know, a final fact would say, yeah, Matt was offensive to whatever degree. But there are a lot of other facts that mitigate in her favor. And so we're going to look at the totality of facts. Bottom line, I just urge the Court not to make any broad rulings about social media on this record, which is simply an amended complaint. And so far as a reasonable reliance, there's too much support out there for the position about sexual orientation discrimination to say as a matter of law her reliance was unreasonable. You've got EEOC and the unbundled decisions. And, you know, what I'm saying is that she was fired because of her exercise of protected activity, and she reasonably believed that discrimination on the basis of sexual orientation was illegal. I don't think the Court can say in the abstract it was not reasonable, and I think that's legal error and it should be reversed and remanded for further proceedings. All right, sir. Thank you very much. That's your argument. We've concluded for the day. Thank you very much.